# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

SHELLY REAVES and PRECISION    )
STRATEGIC SOLUTIONS, LLC,    )
    )
    Plaintiffs,    )
    )
v.    )    **Case No. 3:22-cv-00158**
    )    **Judge Aleta A. Trauger**
CWS POWDER COATINGS    )
COMPANY, L.P.,    )
    )
    Defendant.    )

## MEMORANDUM

Before the court is the Motion for Summary Judgment (Doc. No. 43) filed by defendant CWS Powder Coatings Company, L.P. ("CWS"). For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    FACTS AND PROCEDURAL HISTORY

Plaintiff Shelly Reaves, a present resident of Greene County, Tennessee, is the sole member and director of plaintiff Precision Strategic Solutions, LLC ("Precision"), which she formed in 2009. (Doc. No. 52, Reaves Dep. 26–28.) Because it appears that Precision is effectively an alter ego of Shelly Reaves, the court refers herein to Reaves, singularly, as the plaintiff.

Defendant CWS is in the business of manufacturing and distributing powder coatings for different types of metallic equipment. (Am. Compl. ¶ 6; Am. Answer ¶ 6.) It has been in business since 1999. (Doc. No. 44-2, Abrams Dep. 11.)[1] Jonathan Abrams, who has a Ph.D. in chemical

---

[1] The defendant filed three separate excerpts from Abrams' deposition transcript rather than a single, redacted copy of the transcript. The court, to make it possible to locate the cited portions of this depositions, will refer to it herein by the CM/ECF document number but will use the original deposition transcript pagination.

engineering, has been employed by CWS since 2002. (*Id.* at 7, 11.) His initial job title was sales director. (*Id.*) He became Managing Director for CWS in 2012, which he equated to being the company's CEO. (*Id.* at 11–12.) Abrams testified that he is responsible for, among other things, "handl[ing] the sales" and "getting the accounts" with CWS's customers. (*Id.* at 17.) Reaves disputes that fact, asserting, as discussed below, that she had a verbal agreement to act as an independent sales representative for CWS, such that Abrams was not the only individual responsible for procuring sales for CWS. (*See* Doc. No. 52, Reaves Dep. 35.)[2]

A.      **CWS Acquires Premier As a Customer**

One of CWS's largest customers is SSW Advanced Technologies ("SSW"). (Doc. No. 44-2, Abrams Dep. 15.) SSW operates several manufacturing facilities, including one in Newport, Tennessee, known as American Appliance, or SSW Newport. (*Id.* at 16.)[3]

In 2007, Shelly Reaves was working for Providing System Solutions ("Solutions"), a company with which CWS had a pre-existing relationship. (*Id.* at 27.) Solutions was owned by James Swainston. (*Id.*) Abrams had a "relationship with James Swainston that went back many years." (*Id.*) Swainston, at the time, was selling parts to American Appliance in Newport, Tennessee and told Abrams that he wanted to assist Abrams in getting American Appliance to purchase CWS's product. (*Id.*) In 2007, Solutions and CWS began calling on SSW's American Appliance facility in Newport to obtain its business. (*Id.* at 27–28.) Plaintiff Shelly Reaves, as an agent for Solutions, worked with Abrams to develop business for CWS from American Appliance.

---

[2] Reaves' entire deposition transcript is in the record, and the pagination is consistent with that assigned by CM/ECF.

[3] Abrams' cited deposition testimony, contrary to the defendant's representations in both its Statement of Undisputed Material Fact and its Memorandum in support of its Motion for Summary Judgment, does not state when CWS entered into a relationship with SSW or that CWS became "particularly interested in supplying the American Appliance facility in 2007." (*See* Doc. No. 44, at 5–6.)

(*Id.*) Reaves, in fact, testified at length about her efforts to procure American Appliance as a customer for CWS while she was working for Solutions. (*See* Reaves Dep. 32–37.)

According to Abrams, CWS "had a service agreement with Providing System Solutions," pursuant to which CWS paid Solutions a "five percent commission." (Doc. No. 44-2, Abrams Dep. at 29.) Abrams did not specify what "services" exactly were contemplated by the agreement. While Reaves worked for Solutions, CWS did not pay Reaves directly for "product supplied to SWW." (Reaves Dep. 52.) It paid Solutions.

Reaves left Solutions in 2008 or 2009 and formed Precision in 2009. (Reaves Dep. 27.) Reaves' agreement with Swainston when she left was that she took the "industrial products" accounts with her (*id.* at 28), as her intention was to concentrate on the sale of industrial products to large industries (*see id.* at 22). According to Abrams, because Swainston decided that he did not want to "continue servicing industrial powder coating accounts," Abrams, on behalf of CWS, entered into a verbal agreement with Reaves pursuant to which CWS would pay Reaves a five percent commission for her to "[c]ontinue servicing" CWS's existing client, American Appliance. (Doc. No. 44-2, Abrams Dep. 30.)[4]

In addition, it is undisputed that the parties entered into an unwritten agreement for the payment of a five percent commission by CWS to Reaves in connection with her being a sales representative on other mutually agreed accounts. The parties, however, dispute the terms of the agreement. According to Abrams, CWS does not have "sales reps that get the contract" with CWS's customers for CWS. (Abrams Dep. 17.) Instead, Abrams "handle[s] the sales" and is "responsible for getting the accounts." (*Id.*) However, CWS pays independent sales reps for

---

[4] It is undisputed that CWS continues to pay Reaves commissions on the American Appliance account. (*See* Reaves Dep. 120.)

"servicing those accounts." (*Id.*) Such "[s]ervice work could last as long as CWS deemed that they wanted the person to do the service work. They could continue to . . . pay for the service work." (*Id.* at 23.) In other words, CWS maintains that the contract with Reaves to sell products had "no specific duration" (*id.* at 47) and, therefore, was terminable at either party's discretion. (*See id.* at 54 ("[W]e had a service agreement with Ms. Reaves. At any time that CWS felt that Ms. Reaves was not doing the service work, we were able to not use her to do the service work. It was not an indefinite forever and ever and ever. It was an agreement for her to do service work.").)

Abrams does not explain what he meant by "service work" or "servicing accounts." However, CWS had a written memorandum of its agreement with Solutions in connection with the American Appliance account in effect while Reaves was still working for Solutions, which the defendant represents to be essentially the same agreement that CWS carried over to Reaves after she left Solutions. This memorandum states:

> Please find enclosed the terms of the contract between CWS Powder Coatings and [Solutions] regarding the servicing and supply of powder coatings to American Appliance Newport TN facility . . . .

> CWS will pay [Solutions] the following commission on sales net of freight and trade discounts for the following five products as tested and approved by American Appliance . . . .

> The day-to-day servicing of the American Appliance account will be conducted by [Solutions]. American Appliance will place orders directly with CWS by fax.

(Doc. No. 44-3, April 9, 2008 Letter from Abrams to Swainston.) The plaintiff contends that she never saw this letter prior to this litigation and that the terms of Abrams' agreement with Swainston are not the same as the terms of his agreement with her. (Reaves Dep. 60–61.)

Rather, according to Reaves, she was an "industrial sales rep," not a "service tech." (Reaves Dep. 29, 31.) She distinguished the two roles as follows: "I was a sales rep, and I was being paid commission. Service techs get paid a salary. Sales reps get paid commission on their sales." (*Id.* at

35.) According to Reaves, her agreement with Abrams was to work as a "sales rep." (*See id.* at 36 ("I was always a sales rep. I have never been anything but.").) According to Reaves, all that was required of her to be paid her five percent commission was to "[go] in" and "g[e]t the account." (Reaves Dep. 36.) She described this process as going "out into the field" to call on a particular business, "like American Appliance" or "John Deere or whoever, Caterpillar." (*Id.* at 37.) She would meet with individuals at manufacturing facilities, develop a relationship with them, "look at their process," discuss the client's needs, send quotes, and ultimately "design the system based on their requirements." (*Id.* at 37–38.) She testified that "you work your tail off to get the business, and you focus all of your energy on your account to do that." (*Id.* at 41.) However, once she procures an account for a CWS product that the customer needs on a recurrent basis, as opposed to the one-time sale of a piece of equipment, then every time that customer places a repeat order, she is entitled to receive a commission on that sale. (*Id.* at 38.) As she stated, "if I got the business . . . , I got paid . . . a commission on that account every month based on their usage"; she did not have to do anything else in order to get paid a commission on the sales CWS made to that customer. (*Id.* at 40.) In other words, according to Reaves, once she procured a customer for CWS, she was entitled to a five-percent commission on the products that the customer purchased from CWS for the duration of the customer's relationship with CWS.

In 2010, SSW purchased Premier Manufacturing and its manufacturing facility in Henderson, Tennessee. (Doc. No. 44-2, Abrams Dep. 101.) Abrams testified that, after that acquisition, because SSW was pleased with CWS's service and product at American Appliance, SSW asked CWS to "quote the business at Premier." (*Id.*) Prior to SSW's purchase of Premier, CWS had tried to get the account, with only partial success. Abrams stated that he was the person who called Nick Plesca at Premier and "initiated the possibility of CWS supplying Premier with

product." (*Id.* at 102.) They "started doing some testing and it was not fully successful." (*Id.*) CWS did not "fully" have the account until after SSW purchased Premier. (*Id.* at 101.)

Reaves, when asked directly if she procured Premier as a customer for CWS, testified that Premier was not owned by SSW yet when Carrier Corporation, who was not yet a CWS customer, recommended to Premier that it use CWS's product. (Reaves Dep. at 42–43.) As a result, "Nick" at Premier called Abrams in early 2010, and Abrams called Reaves. They both met up with Nick in Ohio. It was a good meeting, and they "got the trials," apparently meaning that CWS was invited to do product trials at the plant in Henderson. (*Id.* at 43, 49.) Reaves does not indicate what the result of those trials was or what else she did in connection with procuring Premier as a customer for CWS. She stated, apparently referring to the product trials:

> I was on the floor doing test runs, and . . . they would send powder. We would do trials, hand spray parts, put them in the booth.
>
> They had another sales rep that they liked, so it was an uphill battle. We were running a trial, and Bert from CWS was supposed to meet me at the factory. He was a no show, no call, no e-mail. I called Jonathan. I couldn't get him on the phone. So that most certainly hurt. . . .
>
> They are supposed to meet you at the plant while you are doing a test run, and they don't show up. . . . You look like a fool. You show; you have no support, and that's not something customers want to see.

(*Id.* at 45–46.) Reaves does not indicate when this occurred or whether her efforts at that time were successful, but it is clear, based on her assertion that Premier was not yet owned by SSW, that she was talking about efforts she made to procure the account before Premier was purchased by SSW. She offers no evidence about how CWS ultimately obtained Premier as a customer following SSW's acquisition of Premier or how she contributed to that effort.

Regardless, Premier eventually became a CWS customer after its acquisition by SSW, and Reaves and CWS agreed that Reaves would receive a five percent commission on Premier's

purchases from CWS. Reaves testified that she first received payment from CWS for product supplied to Premier by CWS sometime after she started her own company. (*Id.* at 50–51.)

Reaves maintains that she was not a service technician or a service manager; she was an independent sales representative whose income was based "not only upon the accounts she obtained, but also upon the recurring retention by the defendant of those [accounts]." (Doc. No. 45, Pl.'s Resp. SUMF ¶ 13.) She also testified about work she did with Premier around 2015, when it was having "so many issues" and got an entirely "new paint system." (Reaves Dep. 70.) She helped with "handling parts on the line" "to get production out the door" and assisted with "put[ting] in a primary booth." (*Id.* at 71.) Asked what happened in 2016, when, according to CWS's attorney, there was "lots of e-mail" showing that Reaves was engaged in the "day-to-day" servicing of the Premier account and then apparently stopped,[5] Reaves interrupted the question to say she "never agreed to service a customer" and that, as a sales rep, she could not "service a customer on a day-to-day basis." (*Id.*) As a sales rep, her job is to "go out and look for new business," rather than to service clients she had already procured. (*Id.* at 72.) However, if a customer contacts her with a problem, she "get[s] engaged." (*Id.*; *see id.* at 78 ("I service the account when it needs to be serviced.").) According to Reaves, no one from Premier or CWS ever contacted her to say Premier was having problems, so, "as far as [she] knew[, t]hey were running like clock work." (*Id.*; *see id.* at 74 ("If Jonathan wanted me to be somewhere once a week, all he had to do was tell me.").)

Abrams, however, testified that Reaves "serviced" the Premier account adequately until 2016, at which point "her service work at Premier declined and became less and less and less." (Doc. No. 44-2, at 49.) Abrams explained that, beginning in 2016, Reaves "never went to visit the

---

[5] These purported emails have not been introduced into evidence.

customer to do the service work." (*Id.* at 49–50.) He claimed that they had "numerous problems" in 2016, 2017, and 2018 that he believed Reaves was aware of and that CWS "came very close to losing [Premier's] business." (Doc. No. 49-2, Abrams Dep. 94.) According to Abrams, he "made numerous visits to Premier" to maintain the account, spending "thousands of dollars," with "[n]o support" from Reaves. (*Id.*) He testified that Reaves was fully aware of these numerous problems but made no effort to assist him in dealing with them. (*Id.* at 95.) Premier expressed dissatisfaction with Reaves' work to Abrams. (Doc. No. 44-2, Abrams Dep. 50.) According to Abrams, CWS tolerated Reaves' declining effort for several years, but it reduced her commission on sales to Premier to one percent in 2019, based on its perception that she was "not servicing the customer," "does not want to do the service work and is not interested." (*Id.* at 52.) Although Reaves was aware that her commission had been reduced, she did not raise an objection or inquire about it until 2020. (Reaves Dep. 121.)[6] CWS stopped paying her on the Premier account altogether in January 2020.

### B. CWS Acquires Carrier As a Customer

CWS became an approved vendor for another manufacturer, Carrier, in 2002, well before CWS had a relationship with Reaves. (Doc. No. 44-2, Abrams Dep. 104–05.) Becoming an approved vendor was just the first step in the lengthy process of actually becoming a supplier to a Carrier plant. (*Id.* at 105.) CWS was unsuccessful in securing any business from Carrier in 2002. (*Id.* at 111.) It tried and failed again in 2010 and in 2016. (*Id.*) Some time in 2016, however, a contact at Carrier told Abrams to "basically back off" and that Carrier would contact CWS when "the time is right." (*Id.*) In late 2016, Abrams received a call from Alagu Kaliyappan at Carrier,

---

[6] The plaintiff does not dispute this statement, for purposes of summary judgment, but her deposition testimony does not actually identify when she first objected to the reduction of her commission.

asking him to send CWS's pricing and to come up and visit Carrier's plant in Indianapolis to "go through what we are doing." (*Id.* at 112.) Following this contact, Abrams "entered into extensive negotiations with Carrier on [his] own in 2018, 2019, where [he] met with Carrier" in Carrier's corporate offices in Indianapolis and engaged in "[v]ery extensive pricing negotiations." (*Id.* at 107.) He was eventually successful after Carrier "beat [him] down on price." (*Id.* at 108.) Finally, in 2019, Carrier notified him that CWS was an approved vendor and could supply its plant. (*Id.* at 110.) Carrier made its first purchase from CWS in 2019. (*Id.* at 112.)

Abrams testified that he told Reaves that, if CWS was successful in getting Carrier's business in 2010, CWS would engage Reaves "to do the service work." (Doc. No. 50-1, Abrams Dep. 39.) According to Abrams, Reaves had a contact at Carrier who was fired. Abrams' testimony suggests that CWS's failure to get business from Carrier in 2016 was related to that termination. (*See* Doc. No. 44-2, at 74 ("In 2016, we attempted to get Carrier's business. [Reaves] had a contact that – this Mr. Rushing, he left. He was fired from Carrier. And our efforts to get Carrier failed. It ended. We did not get the business.").) He also stated that CWS's intention, as of 2016, was still to "use" Reaves "as a service person for Carrier," if they had secured the business then. (*Id.* at 76.) However, as of 2017, CWS no longer wanted to use Reaves to service the account. (*Id.* at 83.)

According to Reaves, she was "told in 2019" that CWS had obtained the Carrier account. (Reaves Dep. 127.) She knew in 2018 that CWS was "close to getting it," but Abrams had by then "pushed her out." (*Id.*) She never met Kaliyappan, Abrams' contact at Carrier, though she was copied on some emails between them. (*Id.*) She did not participate in any of the negotiations between Abrams and Kaliyappan from 2017 through 2019. (*Id.* at 128.) However, she claims that evidence in the record establishes her continued efforts on the account, pointing to her deposition testimony regarding her participation (with Abrams) on an unsuccessful trial of CWS's product at

Carrier's plant in 2012. (Reaves Dep. 80, 82.) The plaintiff also references—but has not produced—an email from 2016, suggesting that Reaves was present with Abrams at several meetings with a Carrier representative. (*See* Reaves Dep. 87–89.)

The plaintiff also claims that Abrams asked her to meet him in Memphis to attend a meeting at Carrier Corporation around August 1, 2017 but then failed to show up at the time he had arranged to meet her, leaving her stranded in the parking lot. (Reaves Dep. 112–13.) Abrams disputes Reaves' version of events. (Doc. No. 50-1, Abrams Dep. 69–71.) Reaves claims that Abrams stopped communicating with her after August 1, 2017. (*Id.* at 126.)

### C.     The Lawsuit

Reaves filed suit against CWS on December 30, 2021 in the Circuit Court for Williamson County, Tennessee, where she then lived, asserting claims for breach of contract, unjust enrichment, and promissory estoppel. (Doc. No. 1-1.) CWS removed the case to this court on the basis of diversity jurisdiction, and Reaves thereafter amended her pleading to add Precision as a plaintiff. (Doc. No. 36.) In support of her claims, Reaves alleges that she entered into a verbal agreement with CWS prior to February 2010, in which CWS agreed to pay her a commission rate of five percent on all purchases by Carrier from CWS, that she worked for seven years to help CWS procure an account with Carrier, but, shortly before Carrier awarded work to CWS, CWS reneged on its agreement to pay her any commissions on the Carrier sales. (Doc. No. 36 ¶¶ 11–17.) She also alleges that she had an oral agreement with CWS for the payment of five percent commission on all powder coating sales CWS made to Premier and that CWS breached that agreement when it began paying her less than five percent in 2019 and stopped paying her at all in 2020. (*Id.* ¶¶ 20–26.)[7]

---

[7] Although she now denies responsibility for "servicing" any accounts, she specifically alleges in the Amended Complaint that CWS "engaged [her] to service a Premier Manufacturing

Following completion of discovery, the defendant filed its Motion for Summary Judgment, Memorandum of Law, and Statement of Undisputed Material Facts (SUMF). (Doc. Nos. 43, 44, 44-1.) The plaintiff opposes the motion and has both responded to the SUMF and filed her own "Statement of Additional Undisputed Material Facts."[8] (Doc. Nos. 48, 45, 46.) The defendant responded to the Statement of Additional Facts and filed a Reply. (Doc. Nos. 49, 50.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence

account" and agreed to pay the plaintiff her "customary" five percent commission "for her service work." (Doc. No. 36 ¶ 20.)

[8] The Local Rules of the Middle District of Tennessee permit a party opposing summary judgment to file a statement of "additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." L.R. 56.01(c). The court construes the plaintiff's statement of additional facts as falling within the scope of this rule.

is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying and citing specific portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations—that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). If the non-moving party asserts that a fact is genuinely disputed, it generally "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Pittman*, 901 F.3d at 628 ("The nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting *Anderson*, 477 U.S. at 250)). The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and the weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    ANALYSIS

CWS moves for summary judgment on the plaintiff's breach of contract claim, arguing that: (1) as to the Premier account, the plaintiff cannot establish the existence of a binding contract, because there was no meeting of the minds on essential contract terms, including the duration of the contract and whether it was a "procurement" agreement; and (2) the plaintiff cannot establish that she "procured" CWS's business with either Premier or Carrier.

The plaintiff responds that (1) the defendant's motion does not address her promissory estoppel and unjust enrichment claims, so summary judgment on those claims is not warranted and, in any event, she has established at least a material factual dispute as to the elements of promissory estoppel and unjust enrichment, in the alternative to her breach of contract claim; and (2) material factual disputes preclude summary judgment on the breach of oral contract claim. The

plaintiff argues, in particular, that the oral agreement is clearly not void for vagueness, in support of which she points to the fact that the defendant continues to pay her in connection with the American Appliance account. She also asserts that, if indeed the oral contract is terminable at will by either party, then it has not been terminated, because she is still being paid on the American Appliance account. She insists that the most reasonable inference to be drawn from the facts is that Abrams unilaterally decided to cut costs by "cutting [Reaves] out of lucrative contracts." (Doc. No. 48, at 9.) She asserts that Abrams acted in bad faith by cutting her out of the Premier and Carrier contracts without notice (and breached the duty of good faith and fair dealing simply by asserting that the contract is void for vagueness) and that his attempt to characterize her as a "service technician" is contradicted by the evidence in the record.[9]

In its Reply, the defendant argues that the plaintiff has failed to present any evidence to rebut its contention that the oral agreements were terminable at will, because the parties never addressed the issue of termination, and that Reaves "waived" her right to collect commissions on the Premier account by failing to object in 2019, when CWS reduced her commission payments to one percent. It also argues that the plaintiff is not entitled to seek equitable remedies if the court finds that the parties formed "an enforceable at-will agreement." (Doc. No. 49, at 5.)

### A. Generally Applicable Tennessee Contract Law

The parties agree that Tennessee substantive law applies to this dispute. In Tennessee, the essential elements of a breach of contract claim include "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *C & W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676–77

---

[9] She also argues that the oral agreement does not violate the statute of frauds, but the defendant does not raise the statute of frauds defense as a basis for summary judgment.

(Tenn. Ct. App. 2007) (quoting *ARC LifeMed, Inc. v. AMC–Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). Accordingly, for a party to state a breach of contract claim, there must be an enforceable contract.

It is well established under Tennessee law that "a contract can be express, implied, written, or oral, 'but an enforceable contract must result from a meeting of the minds in mutual assent to terms, must be based upon sufficient consideration, must be free from fraud or undue influence, not against public policy and must be sufficiently definite to be enforced.'" *Thompson v. Hensley*, 136 S.W.3d 925, 929 (Tenn. Ct. App. 2003) (quoting *Klosterman Dev. Corp. v. Outlaw Aircraft Sales, Inc.*, 102 S.W.3d 621, 635 (Tenn. Ct. App. 2002)).

Oral contracts are generally enforceable, but the party seeking to enforce an oral contract must demonstrate (1) mutual assent to the terms of the contract and (2) that the terms are sufficiently definite to be enforceable. *Burton v. Warren Farmers Coop.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (internal citations omitted). The mutual assent

> may be manifested, in whole or in part, by the parties' spoken words or by their actions or inactions. It should not, however, be inferred from the unilateral acts of one party or by an ambiguous course of dealing between the parties from which different inferences regarding the terms of the contract may be drawn. Mutual assent also may not rest solely on the uncommunicated intentions or states of mind of the contracting parties.

*Id.* (internal citations omitted). "Indefiniteness as to any essential element of an agreement may prevent the creation of an enforceable contract." *Peoples Bank of Elk Valley v. ConAgra Poultry Co.*, 832 S.W.2d 550, 553 (Tenn. Ct. App. 1991). "If the essential terms of an alleged agreement are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id.* at 553–54 (citing Restatement (2d) Contracts, § 33 (1981)).

At the same time, Tennessee recognizes that the "law leans against the destruction of contracts for uncertainty, particularly where one of the parties has performed his part of the

contract." *APCO Amusement Co. v. Wilkins Family Rest. of Am., Inc.*, 673 S.W.2d 523, 528 (Tenn. Ct. App. 1984) (quoting 17 Am. Jur. 2d Contracts § 75 (1964)). If "feasible," courts are to "construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." *Gurley v. King*, 183 S.W.3d 30, 34 (Tenn. Ct. App. 2005) (quoting 11 Williston on Contracts 813, § 1424 (3d ed. 1968)).

Just because the parties dispute the terms of an oral contract, however, does not necessarily mean that mutual assent is lacking or that the contract is insufficiently definite to be enforced. Rather, it can also mean that there are material factual disputes as to the contract terms that cannot be resolved on a motion for summary judgment. *Accord, e.g.*, *Gurley*, 183 S.W.3d at 46–47 (holding that material issues of fact precluded summary judgment on a breach of oral contract action).

### B.      Premier Contract

CWS's position is that Abrams and Reaves agreed that CWS would pay Reaves a five-percent commission on purchases by CWS customers whose accounts CWS and Reaves mutually agreed would be "serviced" by Reaves and that Premier was one of the agreed-upon accounts. The arrangement, according to CWS, was terminable at will and dependent upon Reaves' actually servicing the account. Also, according to Abrams, he alone was responsible for actually procuring customers for CWS, including Premier, and he terminated the agency relationship with Reaves, as sales representative for Premier, when she stopped servicing the account to his satisfaction.

Reaves' position is that, with respect to Premier, she operated as an independent sales representative; she has always been a sales representative and never a service technician; and she has never been expected to "service" customer accounts on a day-to-day basis. She testified that she and Abrams agreed that she would receive "five percent commission of net receipts for her work with Premier." (Reaves Dep. 77.) She testified that all she had to do to earn a commission

on repeat purchases by a customer was to procure the customer relationship in the first place. The implication is that, because her job was to procure accounts, she procured the Premier account, and she is entitled to a five percent commission on Premier purchases of CWS product for as long as Premier continues to purchase CWS's product. Her claim encompasses an objection to the defendant's unilateral reduction of her commission—from five percent to one percent—from early 2019 until January 2020, when it stopped paying any commission at all. The defendant's only defense to her claim for the four percent by which it reduced commission payments in 2019 is that the plaintiff waived objection to the reduction by continuing to accept commission checks for over a year without objecting, despite actual knowledge that her commission percentage had been reduced. (*See* Reaves Dep. 121–22.)

The plaintiff's third argument in objection to both the reduction of her commission in 2019 and the termination of her status as sales representative altogether is that, to date, the defendant has never terminated the relationship, as demonstrated by the fact that Reaves continues to receive a commission in connection with American Appliance's purchases from CWS.

## 1. The Parties Had an Enforceable Contract

As an initial matter, it is clear that the parties had an agreement under which they operated successfully for a number of years. In this situation, the court would be loath to conclude that the agreement is void (or voidable) for vagueness. Setting aside for a moment any discussion of the disputed terms of the agreement, it is undisputed, at a minimum, that CWS agreed to pay Reaves a five percent commission on Premier's net purchases from CWS for the duration of the parties' agency relationship. In 2019, CWS, without notice or negotiation, reduced the commission to one percent and now claims that Reaves waived her claim to the agreed-upon five percent by accepting payment of the reduced amount without raising any objection, despite her actual knowledge that

her commission payments had been reduced.[10] The plaintiff denies intentionally waiving her right to payment and asserts that she essentially trusted the defendant. (Reaves Dep. 121–23.)

Under Tennessee law, "waiver is the voluntary relinquishment of a known right and is established by express declarations or acts manifesting an intent not to claim the right." *Dallas Glass of Hendersonville, Inc. v. Bituminous Fire & Marine Ins. Co.*, 544 S.W.2d 351, 354 (Tenn. 1976); *Tenn. Asphalt Co. v. Purcell Enters., Inc.*, 631 S.W.2d 439, 444 (Tenn. Ct. App. 1982). Both express and implied waivers must be intentional. *Hill v. Goodwin*, 722 S.W.2d 668, 671 (Tenn. Ct. App. 1986). The waiver of a contractual right must be clear and unequivocal. *Springfield Tobacco Redryers Corp. v. Springfield*, 293 S.W.2d 189, 198 (Tenn. Ct. App. 1956). Finally, Tennessee law requires either consideration or an element of estoppel for a contractual waiver. *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986). This means that "[t]he party seeking to invoke the equitable estoppel must have acted to his detriment in reliance upon the statements or conduct of the party against whom it is to be enforced." *Id.* Tennessee courts also have held that, "by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach." *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby Cty. Airport Auth.*, 169 S.W.3d 627, 636 (Tenn. Ct. App. 2004) (citing 17 Am. Jur. 2d Contracts § 447 (1964)). Generally, however, "[t]he acceptance of a defective performance, without more, does not establish a waiver of contract rights, since it must be shown that the person had knowledge of the facts and had the intent to waive the right to proper performance." 17A Am. Jur. 2d Contracts

---

[10] The defendant does not contend—nor could it—that the claim lies outside the applicable six-year statute of limitations. *See* Tenn. Code Ann. § 28-3-109(a)(3); *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 709 (Tenn. 2019). The first alleged breach by the defendant in this case occurred in early 2019. Reaves filed suit in December 2021—well within the six-year statute of limitations.

§ 628; *see also O'Sullivan Corp. v. Duro-Last, Inc.*, 7 F. App'x 509, 516 (6th Cir. 2001) ("Waiver requires more than an awareness of a breach.").

Under the circumstances here, the court finds that whether the plaintiff intentionally waived the right to the full five percent commission for Premier purchases in 2019 presents a question of fact. CWS has not pointed to evidence of a clear and unequivocal declaration or act expressing the plaintiff's acquiescence to the reduced commission, aside from her continuing to accept payments, nor is there evidence of detrimental reliance by CWS. The court finds that the defendant is not entitled to summary judgment on the plaintiff's claim for an additional four percent commission owed for Premier purchases of CWS product in 2019, before the defendant's termination of the plaintiff's representation in 2020.

### 2. *The Termination in 2020*

The defendant apparently did not give advance notice of its intent to terminate the plaintiff's sales representative agreement; instead it simply stopped paying her commissions on purchases by Premier in January 2020. Although the plaintiff claims that the defendant has never actually terminated the sales representative relationship, the fact that the defendant continues to pay her a commission on American Appliance purchases does not imply that defendant has not effectively terminated the plaintiff's relationship with it as sales representative to Premier. In that regard, the defendant is correct that the doctrine of at-will employment applies, and the defendant, by unilaterally terminating commission payments on Premier sales, unequivocally communicated its intention to terminate that particular relationship. Under Tennessee law, it clearly had the right to do so. *See, e.g.*, *Winkler v. Fleetline Prods., Inc.*, 859 S.W.2d 340, 342 (Tenn. Ct. App. 1993) (confirming that the defendant had the ability to terminate at will a relationship with an independent sales representative). The resolution of that issue in the defendant's favor, however, does not necessarily dispose of the question of whether the plaintiff is entitled to a commission on

post-termination purchases by Premier. That question depends upon the actual terms of the parties' agreement and on whether the plaintiff was the "procuring cause" of sales that were consummated after her termination.

*Winkler* is illustrative, even though not completely on point. There, the defendant manufactured metal and plastic parts for trucks and, as part of that line of business, installed a powder coating paint process. Realizing that the powder coating process had excess capacity, it engaged the plaintiff, a manufacturer's representative with contacts with many manufacturing businesses, to obtain powder coating customers for the defendant. The parties orally agreed that the plaintiff would "procure customers for defendant's paint process" and, in addition, would "service the accounts," that the defendant would pay the plaintiff a "10% commission on all painting work performed for these customers after defendant was paid." *Id.* at 341. The defendant submitted a written contract to the plaintiff that, in addition to the terms to which they had orally agreed, stated that the defendant "had the right to terminate the agreement at will upon thirty days' written notice." *Id.* The plaintiff refused to sign the agreement because he objected to the termination provision, but the parties nonetheless operated under the remaining oral terms for approximately eighteen months, before the defendant sent the plaintiff notice that it was terminating the agreement.

By then, the plaintiff had secured five regular customers for the defendant's paint process. The plaintiff had no obligation regarding pricing but simply received his commission payment once the customer arranged to have items painted and paid the defendant's invoice. "Obviously," the court stated, the plaintiff did not continue to "service any of these accounts" after his termination, but he sued for his commission on paint jobs performed by the defendant after the plaintiff's termination. *Id.* The defendant's position was that "[a]n oral agreement between a

manufacturer and an individual acting as a sales and account representative that does not have a stated term of duration is terminable at will." *Id.* at 342. The court agreed as a general matter that the defendant had the right to terminate an employment agreement at will, and the plaintiff did not challenge the defendant's ability to terminate him. As relevant here, however, he did "seek[] commissions for repeat orders for the painting of items from customers he secured." *Id.* The plaintiff did not contest the fact that his agreement with the defendant required him to "service" the accounts he procured, which generally meant "troubleshooting any complaints concerning the quality or manner in which defendant's customers' products were painted." *Id.* Even though he was unable to continue servicing the accounts after his termination, the court found "[f]rom reading this record" that, "while servicing was involved, the procurement of the customer was the major purpose and servicing was a minor element." *Id.*

The court held that the parties "were free to contract as they saw fit regarding residual commissions." *Id.* The plaintiff's termination was not due to any mis- or malfeasance on the part of the plaintiff, and the record was clear that the parties' agreement was that the plaintiff was to receive a commission on paint jobs performed for all *customers* the plaintiff secured. The court, accordingly, affirmed the trial court's determination that the plaintiff was entitled to a ten percent commission on "the repeat sales of defendant's painting service" by the customers the plaintiff had procured, even after his termination. *Id.* at 343.

*Winkler* establishes two points that are relevant here. The first is that a sales representative clearly may be employed to procure customers, service customer accounts, or both. The plaintiff's attempt in this case to equate "service" with something only technicians are called upon to do ignores the fact that sales representatives are commonly and regularly called upon to service accounts in order to ensure an ongoing relationship and repeat sales. Reaves implicitly

acknowledged as much when she confirmed, in her deposition, that she "service[s] an account when it needs to be serviced." (Reaves Dep. 78.)

The second point is that Tennessee courts recognize the "procuring cause" doctrine, pursuant to which a sales representative may be entitled to continue to receive a commission on the employer's sales to a particular customer, even after the sales representative is no longer employed (or engaged) by the employer, depending upon the terms of the agreement between the sales representative and the employer. *See also Reed v. Kurdziel*, 89 N.W.2d 479, 483 (Mich. 1958) ("[W]hether an agent or broker . . . is entitled to commissions on sales made or consummated by his principal or by another agent depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered."), *quoted in Roberts Assocs., Inc. v. Blazer Int'l Corp.*, 741 F. Supp. 650, 653 (E.D. Mich. 1990).

Generally, if a contract *expressly* provides for commission on all purchases by *customers* procured by the sales agent, then the agent will be entitled to commissions on purchases by those customers, even after the agent's termination, as in *Winkler. Accord Militzer v. Kal-Die Casting Corp.*, 200 N.W.2d 323, 325 (Mich. Ct. App. 1972) (holding that the plaintiff was entitled to a commission "on all reorders, occurring either before or after his termination," from the customers he had procured, where the defendant manufacturer had orally agreed to pay the plaintiff a five percent commission "on *all sales* to *customers he procured*" in a specific geographic region, but noting that, "[i]f plaintiff's contract had called for a 5% Commission for every 'sale' made instead of for every 'customer' procured, then renegotiation in light of shared successes would have been justified as 'fair dealing' under the rule in *Reed v. Kurdziel*"); *accord Westfall v. Brentwood Serv. Grp., Inc.*, No. E2000-01086-COA-R3-CV, 2000 WL 1721659, at *4 (Tenn. Ct. App. Nov. 17,

2000) (where the plaintiff's only employment responsibility was to procure customers for the defendant and the employment agreement expressly provided for a commission on "gross billings" for two years after a customer was procured, without reference to whether the plaintiff remained employed, holding, under *Winkler*, that the defendant owed post-employment commissions pursuant to the language of the contract).

On the other hand, if the contract is "silent" on the question of ongoing commissions, an agent or broker who was the "procuring cause" of a *sale* is entitled to an agreed-upon commission, even if the sale was actually "consummated" by the seller or some other agent, and even if the "authority of the agent has been cancelled by the principal"—*i.e.*, terminated. *Id.* However, as the Sixth Circuit noted, construing *Reed*, "it is the acquisition of *orders*, not the acquisition of the *customer*, that is protected by the 'procuring cause' doctrine." *William Kehoe Assocs. v. Indiana Tube Corp.*, 891 F.2d 293 (Table), 1989 WL 146439, at *2 (6th Cir. Dec. 5, 1989) (emphasis added). In other words, there is a distinction between procuring a *customer* and procuring a *sale*, and only the latter is automatically protected in the absence of express contract terms.

In the ordinary case, it is presumed that a sales representative is entitled to commissions only on sales that she personally worked to procure or to which she was entitled based on her agreement with the seller. For example, in *Roberts*, a sales representative sought commissions on sales consummated after his termination. The district court recognized that, typically, "where the agent does not participate in the negotiation of a given contract of sale with a customer, he is not the procuring cause [of the sale], even though the agent may have originally introduced the customer to the principal." *Roberts Assocs.*, 741 F. Supp. at 652. "[U]nder those circumstances the agent securing the previous order will have no claim for additional commissions," because "in the usual case each subsequent order will require some further customer services." *Id.* at 655. At the

same time, the court acknowledged that, "[i]f subsequent purchase orders are submitted by a customer which involve no additional servicing or negotiation, then the salesman securing the original account may well be entitled to commissions on those sales." *Id.* "It is a question of fact for the jury whether subsequent purchases were effectuated by additional customer services or were made solely on the force of the original representation." *Id.*

In Reaves' case, even giving the plaintiff every benefit of the doubt, she is not entitled to ongoing commissions from Premier purchases of CWS products after her termination. First, her testimony regarding her understanding that her job was simply to procure clients—and that she would be entitled to ongoing commissions, in perpetuity, from all sales from *customers* she procured for CWS—does not establish a meeting of the minds as to that issue. Rather, it is apparent that the parties' agreement was silent on the questions of duration and procurement and that the plaintiff simply assumed that she would be entitled to ongoing commissions from all sales by any customer she procured. In short, the plaintiff cannot establish that the parties agreed that her only job was to procure customers and that she would be entitled to ongoing commissions on all purchases by such customers.

Moreover, even if the court accepts as true Reaves' unsupported assertions to the contrary, the defendant is still entitled to summary judgment, because there is no evidence in the record from which a jury could reasonably conclude that the plaintiff "procured" Premier as a customer for CWS. The plaintiff testified vaguely about efforts in 2010 to procure Premier as a client, after meeting with "Nick." Pressed on that question, she testified unequivocally that Premier had not, at that point, been purchased by SWW. (*See* Reaves Dep. 46 ("At that time, I don't know who owned Premier. I know they were purchased by SSW group later.").) She provided no information about how successful those early efforts were. According to Abrams, they were only partially

successful, and CWS did not "fully" acquire Premier as a customer until after Premier was purchased by CWS's existing customer, SSW. (Doc. No. 44-2, Abrams Dep. 101–02.) Asked directly whether she procured Premier as a client for CWS, Reaves rambled at length without ever answering the question. Aside from arguing generally that her sole job was to procure new customers, she presented no evidence that she was personally responsible for acquiring *Premier* as a CWS customer, even if she may have participated, with Abrams, in the process. Because the evidence, viewed in the light most favorable to the plaintiff, does not give rise to an inference that Reaves procured Premier as a customer, Reaves would not be entitled to ongoing commissions after her termination, even if she could show that a customer-procurement agreement existed.

The next question is whether Reaves may nonetheless be deemed the procuring cause of post-termination purchases by Premier, even if she did not personally facilitate the ongoing purchases. As indicated above, even when a sales representative contract is silent on the question, the law recognizes, as a matter of fairness, that a sales representative will be entitled to ongoing commissions from repeat sales to a particular customer, if the initial sale essentially guaranteed future sales without the need for further servicing of the account. *See Roberts Assocs.*, 741 F. Supp. at 653–55. In this case, regarding ongoing sales, Abrams testified as set forth above that CWS almost lost Premier as a customer and that it was only through concerted efforts on his part that CWS maintained Premier's business after 2019. The plaintiff attempts to refute that testimony, stating only that, if Premier or Abrams needed her, they could have called, but that she was not expected to service the account on a regular basis. She does not refute Abrams' contention that she was not servicing the Premier account during that time frame, and her testimony, even if true, does not refute Abrams' assertion that CWS would have lost Premier's business but for his ongoing efforts from 2017 through 2019, after the plaintiff apparently stopped making efforts to service the

account regularly. Even if the plaintiff could show that Premier's initial sales from CWS were due to her efforts, she has offered no evidence to show that ongoing servicing of the Premier account was not necessary to ensure ongoing purchases or that she was the procuring cause of Premier's continued purchases from CWS after January 2020. Consequently, she is not entitled to continued commissions on purchases by Premier of CWS product following her termination.

The defendant is entitled to summary judgment on the plaintiff's claim that it breached the oral commission agreement when it terminated the relationship and stopped making commission payments in connection with the Premier account in January 2020.

### C. Carrier Contract

The plaintiff also contends that CWS breached its agreement to pay her a commission on purchases Carrier made from CWS. The terms of this purported agreement are very vague, however. If Reaves' position is that CWS agreed that it would pay her a commission on Carrier purchases if the plaintiff procured Carrier as a CWS customer, then the plaintiff's breach of contract claim is obviously without merit, because Reaves did not procure Carrier as a CWS customer. She does not allege that CWS offered her an *exclusive* arrangement, and the undisputed evidence establishes that CWS moved on without Reaves after her (and Abrams') efforts to secure Carrier as a client from 2010 through 2016 were unsuccessful. Reaves claims that she was "cut out" of discussions with Carrier beginning in 2017, and she does not allege that she was involved in the renewed talks or the negotiations that took place from 2017 through 2019 that ultimately culminated in Carrier's first purchase from CWS in 2019.

Further, because the plaintiff did not procure Carrier as a customer and was not involved in the procurement of Carrier's initial purchases from CWS, she likewise cannot, by any stretch of the imagination, be deemed the procuring cause of any Carrier purchases form CWS, regardless of her involvement in CWS's early, unsuccessful efforts to secure the account. *See Roberts*

*Assocs.*, 741 F. Supp. at 652 ("[W]here the agent does not participate in the negotiation of a given contract of sale with a customer, [s]he is not the procuring cause [of the sale], even though the agent may have originally introduced the customer to the principal.").

If the plaintiff's claim is that CWS agreed to use her as a sales representative and to pay her a commission for servicing the Carrier account once it acquired Carrier as a customer, such an agreement would be a type of at-will employment agreement, terminable at will by either party— even before its commencement. *See Crews v. Buckman Laboratories Int'l, Inc.*, 78 S.W.3d 852, 857–58 (Tenn. 2002) ("Tennessee has long adhered to the employment-at-will doctrine in employment relationships not established or formalized by a contract for a definite term. Under this . . . doctrine, both the employer and the employee are generally permitted . . . to terminate the employment relationship at any time for good cause, bad cause, or no cause." (internal citation omitted)). CWS, that is, had the right to unilaterally change its mind about employing Reaves as a sales representative. *Accord Casale v. Nationwide Children's Hosp.*, 682 F. App'x 359, 364 (6th Cir. 2017) (applying the at-will employment doctrine to hold that an employer's withdrawal of an employment offer was not a breach of an express contract). CWS cannot be liable for breaching an alleged agreement to hire Reaves in the future as a sales representative.

CWS is entitled to summary judgment on Reaves' breach of contract claim related to the payment of commissions on the Carrier account.

### D.     The Availability of Equitable Relief

The plaintiff also brings claims for promissory estoppel and unjust enrichment. "Unjust enrichment is a quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist." *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998) (citing *Paschall's Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (Tenn. 1966). "Courts will impose a contractual obligation under an unjust enrichment

theory when: (1) there is no contract between the parties or a contract has become unenforceable or invalid; and (2) the defendant will be unjustly enriched absent a quasi-contractual obligation." *Id.* "A contract cannot be implied, however, where a valid contract exists on the same subject matter." *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991). Thus, a party seeking to recover under a theory of unjust enrichment "must demonstrate . . . [that] there [is] no existing, enforceable contract between the parties covering the same subject matter." *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016) (citation omitted).

"A promissory estoppel claim is based on a clear promise that a plaintiff reasonably relied on to his or her detriment." *Alsbrook v. Concorde Career Colleges, Inc.*, 469 F. Supp. 3d 805, 833 (W.D. Tenn. 2020) (citing *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404–05 (Tenn. Ct. App. 2007). It is an equitable remedy, the application of which is limited to "exceptional cases." *Chavez*, 245 S.W.3d at 404. The elements of promissory estoppel are "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [the plaintiffs] reasonably relied upon the promise to their detriment." *Id.* (citing *Rice v. NN, Inc. Ball & Roller Div.*, 210 S.W.3d 536, 544 (Tenn. Ct. App. 2006)).

As applied to the agreement to pay the plaintiff a commission on sales to Premier, the plaintiff's equitable claims fail as a matter of law, because the undisputed facts establish the existence of an enforceable contract for the payment of commissions on the Premier account. The plaintiff simply lacks evidence to support a breach of that agreement.

With respect to the Carrier account, however, no enforceable contract existed, and the defendant has not addressed the plaintiff's claims for equitable relief in connection with the alleged promises that the plaintiff would be granted that account. Having not addressed the claims at all,

it has not established that it is entitled to summary judgment on the plaintiff's alternative claims for equitable relief.

**IV.     CONCLUSION**

For the reasons set forth herein, the defendant's motion (Doc. No. 43) will be granted in part and denied in part.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge